**UNITED STATES of America,
Plaintiff,**

v.

**Levan CLARK, Defendant.**

**No. 04–CR–123.**

United States District Court,
E.D. Wisconsin.

Aug. 21, 2004.

Gregory J. Haanstad, Wm. J. Lipscomb, Milwaukee, WI, for Plaintiff.

Rodney L. Cubbie, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Defendant Levan Clark was indicted for conspiring to possess with intent to distribute five or more kilograms of cocaine. He retained former Assistant United States Attorney ("AUSA") Rodney Cubbie as his lawyer. The government moved to disqualify Cubbie as Clark's counsel, arguing that Cubbie was barred from representing Clark in this particular case because of his previous work as an AUSA. I held a hearing on the matter and now conclude that the government's motion must be granted.

## I. FACTS

Cubbie was employed as an AUSA in the United States Attorney's Office ("Office") in Milwaukee from April 1989 until May 1997. Between November 1993 and December 1996, he headed the Organized Crime Drug Enforcement Task Force ("OCDETF"), in which capacity he supervised several lawyers. As a supervisor, Cubbie assigned cases within the OCDETF, fielded questions and served as a sounding board for the AUSAs under him, and reviewed and approved prosecution decisions. Under Office procedure, an AUSA in the OCDETF could not go to the Grand Jury to obtain an indictment without first obtaining Cubbie's approval and that of two lawyers above him in the Office's chain of command. An AUSA would typically obtain such approval by drafting

a prosecution memo, which summarized the evidence and the proposed charges, and then submitting it to Cubbie and the other two lawyers for their signatures. Prosecution memos were considered work product and not made available in discovery.

On December 27, 1994, the Office opened a file on a drug trafficking investigation centered on Andre Shawn Crenshaw (the "Crenshaw investigation" or "Crenshaw matter"), which listed Cubbie as the AUSA assigned to the case. (Gov't Ex. 1.) Cubbie later assigned the case to AUSA Pamela Pepper, and on July 12, 1996, Pepper drafted a prosecution memo (Gov't.Ex. 14),[1] and submitted it to Cubbie, Criminal Division Chief Francis Schmitz and U.S. Attorney Thomas Schneider for approval. The memo evaluated the evidence against and identified as potential defendants Crenshaw, Travis Bean, Anthony Bean, Robert Bean, Elijah Rimmer, Michael Hudson, Jeffrey Smith, Jeffrey Coleman and the defendant in the present case, Levan Clark. Pepper's memo was approved in part because on June 16, 1996, the persons named in it except for Hudson, Smith, Coleman and Clark were indicted.[2]

Thomas Gorecki, the lead law enforcement agent on the Crenshaw matter, testified that he prepared a number of reports on the investigation and forwarded them to Cubbie as the assigned AUSA. (Gov't.Ex. 3–11.) In March 1995, Gorecki learned that Crenshaw had met with Hudson, Smith and Clark in Houston concerning the transportation of cocaine to Milwaukee, and he obtained records from Houston hotels confirming their presence there. (Gov't. Ex. 18 at 5–6, ¶ 9.) Gorecki testified that he believed that he discussed obtaining such records with Cubbie, and that Cubbie also assisted him in obtaining a subpoena for phone records related to the investigation. Gorecki also stated that in August 1995, he debriefed a witness in the Crenshaw case, Lois Wheeler, and that Cubbie was present for at least part of the interview. (See Gov't. Ex. 13.) Gorecki further testified that after Cubbie assigned the case to Pepper, he complained to Cubbie about Pepper's lack of progress on the case, that he continued to forward reports to Cubbie, and that he had other conversations with Cubbie about the case.

Cubbie testified that he did not recall working on the Crenshaw investigation, talking to Gorecki about it, or seeing any of Gorecki's reports. He also did not recall the Wheeler debriefing or reading or signing Pepper's prosecution memo. He testified that he had been a hands off supervisor, that his involvement in the matter, if any, was of a formal nature, and that he possessed no information about Clark's case resulting from his service as an AUSA.

## II. DISCUSSION

### A. Disqualification Standard

█ The Sixth Amendment protects a defendant's right to choose his own counsel. *United States v. O'Malley*, 786 F.2d 786, 789 (7th Cir.1986) (citing *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). However, such right is not absolute and may be outweighed if chosen counsel has a potential conflict of interest as the result of his prior representation of other defendants or government witnesses, or by his previous or ongoing relationship with the government. *See, e.g., Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *United States v. Algee*, 309 F.3d

---

1. Because the memo was work product, the parties agreed that it could be submitted under seal for in camera review.

2. The government was unable to find a signed copy of Pepper's memo.

1011, 1013 (7th Cir.2002), *cert. denied,* 538 U.S. 925, 123 S.Ct. 1595, 155 L.Ed.2d 317 (2003); *United States v. Combs,* 222 F.3d 353, 360–61 (7th Cir.2000); *O'Malley,* 786 F.2d at 790–91. Such a conflict might prevent a lawyer from vigorously representing one client to the detriment of another, *Combs,* 222 F.3d at 361; *see also Hall v. United States,* 371 F.3d 969, 973 (7th Cir.2004), or provide the lawyer with an unfair advantage against his former client, *Huston v. Imperial Credit Commer. Mortg. Inv. Corp.,* 179 F.Supp.2d 1157, 1168 (C.D.Cal.2001).

Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. *Wheat,* 486 U.S. at 160, 108 S.Ct. 1692; *see also Combs,* 222 F.3d at 361. Thus, the Supreme Court has held that district courts must be afforded substantial latitude in ruling on disqualification issues, not only in cases where there is an actual conflict, but also where there is a potential conflict. *Wheat,* 486 U.S. at 163, 108 S.Ct. 1692. The district court must recognize a presumption in favor of the defendant's counsel of choice, but that presumption may be overcome by a demonstration of an actual conflict or a serious potential for conflict. *Id.* at 164, 108 S.Ct. 1692.

In the present case, the government seeks to disqualify Cubbie based on his previous service as an AUSA. It relies on 18 U.S.C. § 207(a), which provides in relevant part:

> Any person who is an officer or employee ... of the executive branch of the United States ... and who, after the termination of his service or employment with the United States .... knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department, agency, court or court-martial of the United States ... on behalf of any other person ... in connection with a particular matter -
>
> (A) in which the united States ... is a party or has a direct and substantial interest,
>
> (B) in which the person participated personally and substantially as such officer or employee, and
>
> (C) which involved a specific party or specific parties at the time of such participation, shall be punished as provided in section 216 of this title.

In enacting § 207(a), Congress's purpose was to protect the public from an individual attempting to use not the expertise, but the specific knowledge obtained while serving as a public servant. Among other things, the statute seeks to prevent such knowledge from being used against the government itself. Grant Dawson, *Conflict of Interest: Working Guidelines for Successive Conflicts of Interest Involving Government and Private Employment,* 11 Geo. J. Legal Ethics 329, 339–40 (Winter 1998). The statute "implement[s] the principle 'that a public servant owes undivided loyalty to the Government.'" *United States v. Medico Indus., Inc.,* 784 F.2d 840, 842–43 (7th Cir.1986) (quoting H.R.Rep. No. 748, 87th Cong., 1st Sess. (1961)). Section 207(a) accomplishes this purpose by prohibiting an official from changing sides on the same "particular matter." *Id.* at 843. According to the House committee which considered the proposal that became § 207(a), "'an official should be prohibited ... from "switching sides" in a matter which was before him in his official capacity.'" *Id.* (quoting House Report at 4.)

Under § 207(a), a former government employee is disqualified only if the particular matter involves the same "specific party or parties." *Id.* In addition, a former government employee is disqualified only

if, while working for the government, he participated in the matter "personally and substantially." *Id.; see also United States v. Martin,* 39 F.Supp.2d 1333, 1334 (D.Utah 1999). The phrase "personally and substantially" is defined in 5 C.F.R. § 2637.201(d), as follows:

> The restrictions of section 207(a) apply only to those matters in which a former Government employee had "personal and substantial participation," exercised "through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise." To participate "personally" means directly, and includes the participation of a subordinate when actually directed by the former Government employee in the matter. "Substantially," means that the employee's involvement must be of significance to the matter, or form a basis for a reasonable appearance of such significance. It requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue. A finding of substantiality should be based not only on the effort devoted to a matter, but on the importance of the effort. While a series of peripheral involvements may be insubstantial, the single act of approving or participation in a critical step may be substantial. It is essential that the participation be related to a "particular matter involving a specific party."

## B. Application of Standard to the Present Case

▮ Cubbie does not dispute that he was at least minimally involved in the Crenshaw investigation, or that the Crenshaw investigation and the present charge against Clark constitute the same "matter." The facts support his concession: the Crenshaw investigation, which took place between 1994 and 1996, overlaps with the present indictment, which covers the period of November 1994 to April 2004; the government alleges that during the years that overlap Crenshaw supplied Clark with cocaine; and Pepper's prosecution memo and Gorecki's reports identified Clark as a participant in the Crenshaw matter. Thus, the government has shown the Cubbie participated in a "particular matter involving a specific party." 5 C.F.R. § 2637.201(d).

▮ However, Cubbie questions whether his participation in the Crenshaw matter was "personal" and "substantial." Under 5 C.F.R. § 2637.201(d), personal participation means direct participation, including the participation of a subordinate if the subordinate was directed by the former government employee. Cubbie participated in the Crenshaw matter both directly and as a supervisor. Cubbie was the assigned AUSA when the Crenshaw file was opened; he received Gorecki's investigative reports and discussed the matter with Gorecki; he participated in at least one debriefing; and he likely assisted Gorecki in obtaining hotel records and a subpoena for phone records. He later assigned the matter to Pepper, his subordinate, but continued to receive reports from Gorecki, and supervised Pepper's handling of the matter, including approving in whole or in part her prosecution memo. These activities are sufficient to satisfy the "personal" participation requirement.

▮ Cubbie's participation was also "substantial." "Substantially" means that the lawyer's involvement was of significance to the matter, or sufficient to create a "reasonable appearance" of such significance. While a series of peripheral involvements may be insubstantial, the single act of approving or participation in a critical step may be substantial. 5 C.F.R. § 2637.201(d). Under this standard, Cubbie's approval of the Crenshaw prosecution

memo, by itself, satisfies the "substantial" involvement requirement.[3] Moreover, the fact that he was the assigned AUSA when the matter was opened, later assigned the matter to another AUSA under his supervision, received investigative reports, discussed the matter with Gorecki, and likely assisted in obtaining hotel records and subpoenas, in combination create a "reasonable appearance" of significant involvement.

The present case is similar to *United States v. Martin*, where the court disqualified a former AUSA, Gordon Campbell, under § 207. The court found that Campbell was personally involved in the matter because he had "supervisory responsibility over the case, personally meeting with FBI agents to discuss the matter and reviewing and approving investigative decisions as the case proceeded." 39 F.Supp.2d at 1334. The same is true in the present case: Cubbie was initially the assigned AUSA, before he passed the case to Pepper, over whom he had supervisory authority; he personally received reports from the investigating agent and discussed the matter with him; he likely assisted in obtaining hotel records and subpoenas; and he received and reviewed the prosecution memo.

The *Martin* court found that Campbell's involvement was substantial because he authorized investigative activities by the FBI, authorized the use of a polygraph on the target of the investigation, was in a position to render prosecutive opinions in the matter, required interviews of the target of the investigation and requested investigation into other aspects of the case. Campbell issued at least one grand jury subpoena for records and received those records pursuant to that grand jury subpoena. Campbell further participated in strategy meetings concerning the timing of the indictment. *Id.* at 1335. The court rejected Campbell's suggestion that this was not substantial involvement because he, in fact, made no prosecutorial decisions and did not even review the documents obtained. The court based its conclusion not simply on the fact that Campbell had approved or decided to issue subpoenas. Rather, the court found "Campbell's involvement in a supervisory capacity, taken as a whole, creates the 'reasonable appearance' of significance, especially when viewed in combination with the 'single act of approving or participation in' the 'critical step' of issuing the subpoena[s]." *Id.* The same is true in the present case. Cubbie testified that he did not recall reviewing the investigative reports or making any decisions regarding the Crenshaw matter. Nevertheless, his involvement creates the "reasonable appearance" of significance.

Cubbie argues that *Martin* is distinguishable because in that case the court had more specifics on what the former AUSA did. I conclude that the government has presented sufficient evidence, recounted above, from which I may conclude that Cubbie was personally and substantially involved. (*See* Gov't. Ex. 3–11, 13, 14.)

■ Cubbie also argues that he has little or no recollection of the Crenshaw investigation, which took place eight years ago. I have no doubt that this is true. Nevertheless, under the statute and implementing regulation this is irrelevant. Disqualification does not depend on whether the former government lawyer has actual knowledge or acted with intent to violate his ethical duty. *See United States v. Trafficante*, 328 F.2d 117, 120 (5th Cir.

---

**3.** Cubbie notes that the approval of others in the chain of command was necessary to obtain the Crenshaw indictment. Nevertheless, his approval was a "critical step" in the Crenshaw prosecution; the matter could not have gone forward without his blessing.

1964) ("It is not necessary, in order that disqualification result from a prior employment, that it be shown that the attorney acquired knowledge while representing the prior client which could operate to his disadvantage in the subsequent adverse representation.").[4] This is so because the statute is concerned as much with the appearance of impropriety as with actual impropriety. *See United States v. Dorfman,* 542 F.Supp. 402, 407 (N.D.Ill.1982) (stating that § 207 was enacted to eliminate the perception of a "revolving door" between government service and private practice).

■■ Cubbie contends that because he left the U.S. Attorney's Office in 1997 there is no appearance of impropriety. Timing alone cannot be dispositive. The matter before the court has been under investigation for over a decade and commenced when Cubbie was the AUSA in charge. The appearance of impropriety to the investigating agents, the government, and the public cannot be dissipated solely by the passage of time. In any event, the Seventh Circuit made clear in its discussion of § 207(a) in *Medico* that I am not permitted to engage in a case specific analysis of whether there is an appearance of impropriety or a risk of actual harm to the government:

> A legislature that seeks to achieve a goal (such as reducing misuse of information or the exercise of undue influence on one's former subordinates) can do so in one of two ways. First, it may identify the objective and instruct courts or agencies to design rules to achieve more of that objective. This method permits fine tuning in individual cases at the expense of imprecision and uncertainty in the run of cases. Second, Congress

may pick the rules itself and make them the measure of the objective. The selection of the rule denotes what the goal is worth to Congress, how best to achieve that goal, where to stop in pursuit of the goal. Any rule of this character will overshoot in some respects and fall short in others. In other words, it will be overbroad and have loopholes at the same time. Yet a court may not convert a rule into a general standard without reversing the choice Congress made. When Congress chooses the rule rather than the objective, a court must turn aside claims of the sort Medico makes— that its conduct does not undercut the legislatures objective and therefore should be permitted. Congress rejected that sort of claim when it chose to write a sharp rule rather than a statute such as "no employee of the government shall change sides where that creates a significant risk of injury to the legitimate interests of the United States."

*Medico,* 784 F.2d at 844 (internal citations omitted).

■■ Finally, Cubbie argues that the motion is untimely. He was retained by Clark in April 2004, yet the government did not move for disqualification until August 4, 2004, shortly before trial was scheduled to commence. The government explains that it did not fully realize the nature of Cubbie's conflict until recently. I have no reason to doubt the government's explanation, but, more importantly, the strictures of § 207(a) cannot be waived through the inaction of government employees. Rather, the statute operates by force of Congress's decision. *Id.* at 845.

---

4. The *Trafficante* court also specifically noted: "We do not say, and the record is free from any intimation, that [counsel] has been guilty of any intention[al] wrong, nor has his conduct been such as to suggest any turpitude."

Nevertheless, the court held "that a case has been made out for the disqualification of [counsel] to represent those appellees who have retained him in this case." *Id.*

Nevertheless, the government should have raised this issue sooner, before Cubbie and Clark had invested substantial time and energy in the case. Now, Clark must start all over with a new lawyer, which will likely result in the delay of his trial. In the future, the government should be more vigilant and raise questions of conflict promptly.[5]

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the government's motion to disqualify Attorney Rodney Cubbie (Docket # 24) is GRANTED.

---

**5.** I acknowledge the burden this decision places on defendant's right to counsel of choice. However, "that right is not without limitation, particularly when counsel of choice has a 'previous or ongoing relationship with an opposing party, even when the opposing party is the Government.'" *Martin*, 39 F.Supp.2d at 1336 (quoting *Wheat*, 486 U.S. at 159, 108 S.Ct. 1692). Even in light of the presumption in favor of counsel of choice, I conclude that Cubbie must be disqualified under § 207.